## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                      CRIMINAL ACTION

VERSUS                                                    No. 24-206

JOHNNY WELLS                                          SECTION I

### ORDER AND REASONS

Before the Court is a motion[1] to suppress filed by defendant Johnny Wells ("defendant"). Defendant seeks to suppress a firearm seized pursuant to an allegedly defective search warrant, as well as any fruits of the unlawful search.[2] The government filed a response in opposition[3] and defendant filed a reply.[4] The Court held a hearing on the motion, after which, defendant and the government filed supplemental briefing.[5] For the reasons set forth below, the Court grants the motion.

## I.    BACKGROUND

In the early morning hours of January 29, 2021,[6] two New Orleans Police Department ("NOPD") officers of the Violent Offender Warrant Squad ("VOWS"), Officer Travis Johnson ("Officer Johnson") and Officer Sean Ogden ("Officer Ogden"), were engaged in a fugitive investigation.[7] They were looking for two suspects— Rashad Boult ("Rashad") and Donovan Davis ("Donovan")—who were wanted for the

---

[1] R. Doc. No. 36.
[2] *See id.*
[3] R. Doc. No. 39.
[4] R. Doc. No. 45.
[5] *See* R. Doc. Nos. 58, 60.
[6] R. Doc. No. 59, at 39.
[7] *Id.* at 51.

carjacking of a 2008 Honda Civic (the "carjacked vehicle"). The officers knew that Rashad and Donovan were juvenile African American males.[8]

The officers saw the vehicle they believed to be the carjacked vehicle parked in front of a duplex residence located at 3409 Pauger Street in New Orleans (the "residence").[9] Having located the carjacked vehicle, they set up a surveillance hoping to locate the wanted suspects.[10]

Around 5:50 A.M.,[11] Officers Johnson and Ogden observed two African American males exit the residence, enter the carjacked vehicle, and drive away.[12] The officers broadcasted their observation that the carjacked vehicle was leaving the residence to other law enforcement officers in order "to take some type of police action."[13] Shortly after their initial departure in the carjacked vehicle, around 6:05 A.M.,[14] the two individuals returned to the residence in the carjacked vehicle.[15] While defendant remained in the passenger seat, the driver exited the carjacked vehicle and retrieved a long gun from another vehicle parked nearby.[16] The driver then returned

---

[8] *Id.* at 38.

[9] Officer Johnson testified that they had identified the 2008 Honda civic that was parked outside of the residence as the carjacked vehicle because it was the same make, model, and color as the carjacked vehicle and had damage that matched the damage that the original incident report described the carjacked vehicle as having. *See id.* at 39, 55. Officer Johnson could not recall whether they had run the license plate on the car they observed, or whether they could see the license plate from where they were conducting surveillance. *See id.* at 40–41, 58–59.

[10] *Id.* at 40.

[11] R. Doc. No. 36-3, at 3.

[12] R. Doc. No. 59, at 41.

[13] *Id.* at 41, 44.

[14] *Id.* at 62; *see also* R. Doc. No. 36-3, at 3.

[15] R. Doc. No. 59, at 43.

[16] *Id.*

to the carjacked vehicle, and again, the two drove away.[17] Officers Johnson and Ogden did not follow the carjacked vehicle either time it departed from the residence.[18]

When the carjacked vehicle returned, at approximately 6:30 A.M.,[19] three individuals exited: defendant from the passenger seat, the driver from the driver's seat, and a pregnant woman from the rear passenger seat.[20] Defendant was carrying the same long gun previously retrieved by the driver.[21] The three entered apartment B of the residence.[22] By this point, other law enforcement officers had arrived, and a perimeter was set up on the residence.[23] After the perimeter was established, the officers performed a "call out" in which they directed everyone inside of the residence to exit.[24]

### a.    _Obtaining the Warrant_

While the perimeter was being set,[25] Officer Johnson called the on-call NOPD detective in the seventh district,[26] Detective Wayne Lewis ("Detective Lewis"), to

---

[17] _Id._ at 44.

[18] _See id._ at 45–46.

[19] _See id._ at 12; _see also_ R. Doc. No. 36-4, at 2.

[20] _See_ R. Doc. No. 59, at 44–45.

[21] _See id._ at 54.

[22] _Id._ at 45.

[23] _See id._ ("Q. All three of those occupants entered Apartment B of 3409 Pauger; right? A. Yes, ma'am. Q. And that's when you decided to set up a perimeter surrounding that apartment? A. Yes, ma'am. . . . Q. And by then, had the marshals or any other law enforcement arrived when you decided to set up the perimeter? A. Yes. So if we were going to set up a perimeter, at least there had to have been enough personnel to set up a perimeter in the area, yes, ma'am."); _see also_ R. Doc. No. 36-3, at 3.

[24] R. Doc. No. 59, at 79.

[25] _Id._ at 62 ("Q. Do you recall what time you called? A. It was during the time we were actually setting up a perimeter on the residence to notify Detective Wayne Lewis.").

[26] _See id._ at 6–7.

obtain a search warrant for the residence.[27] Officer Johnson told Detective Lewis that they had located a vehicle that was involved in a carjacking and that they had observed two black males exit that vehicle with a firearm and enter the residence.[28] Officer Johnson could not recall whether he had told Detective Lewis about the pregnant woman.[29] Officer Johnson explained to Detective Lewis that they were looking for Donovan and Rashad,[30] two African American males who were wanted for the carjacking, and that they needed the warrant to determine whether the persons in the residence were the wanted subjects.[31] Officer Johnson testified that he did not convey to Detective Lewis that the two individuals who had exited the carjacked

---

[27] *Id.* at 8–9. Other than assisting in acquiring and executing the search warrant, Detective Lewis did not have any involvement in the carjacking case. *See id.* at 7–8, 23–24 ("Q. Okay. And as far as the carjacking investigation, you had no involvement whatsoever at all? A. No.").

[28] *Id.* at 8, 62, 66. Officer Johnson could not recall whether he had told Detective Lewis that he had seen the individuals with one firearm or two. *See id.* at 62. But he confirmed with the Court that he never saw two guns. *See id.* at 63 ("THE COURT: Am I correct you never saw two guns at one time, two rifles at one time? You only saw one rifle at a time; is that right? THE WITNESS: One rifle, two people, yes. THE COURT: And each of the persons had it at a different time? THE WITNESS: Yes, sir.").

[29] *Id.* at 63–64.

[30] *Id.* at 33.

[31] *Id.* at 69–70 ("THE COURT: Well, did you ever tell [Detective Lewis] that you wanted the warrant for that purpose? For that purpose 'to identify the subjects,' did you ever say that to him? THE WITNESS: That we want to identify? THE COURT: Yeah, yeah. The part of the warrant that says the warrant is wanted 'to identify and arrest the armed subjects and determine if the wanted subjects are occupied within,' did you ever go ahead and tell him on the phone that's why you wanted the warrant? THE WITNESS: Yes. When we got on scene, we didn't know who they were. So we relay[ed] the information that they need[ed] to get a search warrant . . . .").

vehicle were, in fact, Donovan Davis and Rashad Boult,[32] and Detective Lewis testified that he did not have that impression.[33] Nor did Officer Johnson convey that they needed the search warrant for anything else.[34] Officer Johnson also told Detective Lewis that they were setting up a perimeter on the residence and were "about to attempt to take them down,"[35] however, he did not relay to Detective Lewis that the officers were going to call anyone out of the house.[36]

Detective Lewis began drafting the warrant application after his call with Officer Johnson. The warrant affidavit includes two short paragraphs, which state:

---

[32] In fact, Officer Johnson explicitly testified that he did not know whether the two subjects he had seen enter the house were the people wanted in the arrest warrant, and that he relayed the same to Detective Lewis. *See* R. Doc. No. 59, at 75, 79.

[33] *Id.* at 20 (Detective Lewis testimony) ("Q. If you can recall, were you under the impression that the two people named, that Officer Johnson gave you the two names of the people that they were looking for, for the carjacking were the same two people that had gotten out of the car? A. I had no impression. I was just told that two black males got out of the car with assault rifles and went into the residence. . . . Q. So when you were preparing that warrant, it's your testimony that it wasn't necessarily a connection for you that they'd named two people, both black males; and then the next sentence, you're saying two males are getting out of the car? A. I didn't put in my warrant that those two people got out of the car. I put in the warrant that two black males exited the vehicle.").

[34] *Id.* at 73 ("THE COURT: Did you ever tell Detective Lewis that the search was just for the persons who we want to identify in the house and not for anything else? In other words, what you wanted to obtain as a result of the search warrant, did you ever relay that to Detective Lewis? THE WITNESS: That we were just trying to identify, yes, sir. THE COURT: Did you say there was any other reason to get -- there was any other evidence in the house that you wanted to get? THE WITNESS: For us, no. We weren't concerned about the evidence, but that information is relayed to them to have.").

[35] *Id.* at 66.

[36] *Id.* at 20, 27, 32–33 (Detective Lewis explaining that he knew the perimeter was being set up to "secur[e] the residence" and ensure "no one gets in or out of that residence" but was not told whether they "were going to call the people out" of the residence).

WHERE THE FOLLOWING DESCRIBED ITEM(S) IS/ARE BELIEVED TO BE LOCATED:

Your affiant is requesting a search warrant of the residence to identify and arrest the armed subject[sic] who were in possession of the stolen vehicle, to determine if the wanted subjects are occupied within and to collect any and all evidence relative to an armed robbery which include but are not limited to firearms, holsters, ammunition, vehicle keys, key fobs, and electronic communication devices.[37]

\* \* \*

PROBABLE CAUSE IS BASED ON THE FOLLOWING FACTS:

On Friday, January 29, 2021 , N.O.P.D. Violent Offender Warrant Squad, conducted surveillance at 3409 Pauger Street for wanted subjects Donovan Davis (b/m, [REDACTED]) and Rashad Boult (b/m [REDACTED]) who committed an armed carjacking under N.O.P.D. Item # A-32581-21, in which a silver 2008, four door Honda Civic, bearing Mississippi License plate JGD12160, was stolen. The officers observed the vehicle arrive at the residence at approximately 6:30 AM and two black males exited the vehicle, armed with assault rifles and entered apartment B of 3409 Pauger Street.[38]

Detective Lewis continuously testified that he relied on what Officer Johnson told him over the phone to draft the warrant affidavit, and that he wrote therein exactly what Officer Johnson told him.[39] However, Detective Lewis also testified that

---

[37] *See* R. Doc. No. 36-4, at 1.

[38] *Id.* at 2.

[39] R. Doc. No. 59, at 9–10 ("Q. . . . You wrote down exactly what they told you? A. All of the factors that they gave me in terms of probable cause to search the residence was put into the warrant. Q. Do you recall if you did any of your own writing or adding in, you know, as far as making a narrative seem more – A. No, that's . . . Q. – together or whatever, nothing like that? A. No, no, ma'am."); *see also id.* at 12 ("Q. It says, 'Armed with assault rifles.' A. Okay. Q. And it has an 'S.' A. Okay. Q. As if there were more than one, okay. And do you recall – I believe the judge already asked you this, but for record purposes and clarification – if Officer Johnson told you one gun or two guns? A. I can't – if I put 'rifles,' then that's what I would have received from Officer Johnson."); *id.* at 30 (Detective Lewis testifying that it is his habit and practice to write down exactly what the officer who called him tells him over the phone).

he was independently aware of the carjacking as well as the fact that "two people were wanted" with respect to the carjacking.[40] Detective Lewis also testified that he independently researched the item number associated with the carjacking in order to get the dates of birth for Donovan and Rashad that he incorporated in the warrant affidavit.[41] In addition, Officer Johnson testified that he did not tell Detective Lewis to include any specific language in the warrant.[42]

Detective Lewis digitally signed the warrant affidavit at 7:50 A.M.[43]  It was then sent to Detective Lewis's direct supervisor, Anthony Bakewell, for review before it was sent to the issuing judge.[44]  Bakewell digitally signed the warrant affidavit at 8:07 A.M.[45] Judge Juana Lombard ("Judge Lombard") granted the search warrant; her digital signature indicates that she signed the warrant at 8:27 A.M.[46]  Detective Lewis never received a follow-up call from Officer Johnson or any other officer at the residence prior to the warrant's issuance.[47]

---

[40] *Id.* at 33–34.

[41] *Id.* at 34.

[42] *Id.* at 66 ("THE WITNESS: Oh, I wasn't aware of what he put in [the warrant affidavit], no, sir. THE COURT: That isn't your language, 'to identify and arrest the armed subject'? That was his language? THE WITNESS: Yes, sir.").

[43] R. Doc. No. 36-4, at 2.

[44] *See id.*

[45] *Id.*

[46] *Id.* at 5.

[47] R. Doc. No. 59, at 26, 68–69.

b.    *Search of the Residence*

While the warrant was being prepared, officers on the scene performed the call out.[48] Four occupants exited the residence: the three individuals seen in the carjacked vehicle (defendant, the driver, and the pregnant woman) and a fourth individual— defendant's father, Johnny Wells, Sr.[49] Officers detained the four individuals, placed them in handcuffs, and sat them on the sidewalk.[50] At this point, officers identified the individuals they had observed in possession of the carjacked vehicle; the driver was identified as Davonn Davis ("Davonn"), Donovan's twin brother, and defendant, the passenger, was identified as Johnny Wells, Jr.[51] Importantly, the officers recognized upon identification that none of the occupants that had exited the house were Donovan or Rashad, the subjects of the arrest warrant.[52] Officer Johnson testified that he knew that the carjacking involved four individuals, even though the only arrest warrants were for Donovan and Rashad.[53]

While the individuals were detained, Officers Johnson and Ogden interviewed them to gather information about where the officers might locate Rashad and

---

[48] Officer Johnson could not recall the exact time the call out occurred, however, he testified that the call out would have happened before defendant was arrested at 7:30 A.M. *See id.* at 46–47. Detective Lewis did not finalize and sign the warrant affidavit until 7:50 A.M. *See* R. Doc. No. 39-4, at 2 (time-stamped watermark behind Detective Lewis's signature).

[49] R. Doc. No. 59, at 49–50.

[50] *Id.* at 52; *see also* R. Doc. No. 36-3, at 4.

[51] R. Doc. No. 59, at 48; *see also* R. Doc. No. 36-3, at 3 (explaining that Officer Johnson could identify defendant as the passenger seen in the carjacked vehicle because defendant was wearing a red hoodie with a white logo that "assisted [Officer] Johnson in identifying Mr. Wells for the entirety of [the] investigation").

[52] R. Doc. No. 59, at 52, 72.

[53] *Id.* at 78.

Donovan, as well as whether there was anything or anyone in the residence, such as other people, weapons, dogs, children, and other "things of that nature."[54] In accordance with VOWS practice, other VOWS officers entered the residence to conduct a safety sweep to ensure that no one, including the wanted individuals, had remained inside despite the call out.[55] The safety sweep confirmed that there was no one else in the residence; this was communicated to the rest of the team on scene with an "all clear" call.[56]

At some point while on scene, officers ran defendant's name through a database and confirmed that he had a criminal history.[57] Having learned of his criminal history, the officers arrested and charged defendant with being a felon in possession of a firearm and contributing to the delinquency of a minor.[58] Defendant was arrested at approximately 7:30 A.M.[59]

Sometime after Judge Lombard signed the search warrant at 8:27 A.M., Detective Lewis physically delivered it to the residence and participated in its execution.[60] At the time Detective Lewis and other officers arrived to execute the

---

[54] *Id* at 80.
[55] *See id.* at 83–84.
[56] *Id.* at 88–89.
[57] *Id.* at 52.
[58] R. Doc. No. 36-6, at 2. Defendant was not a minor at the time. Officer Johnson testified that he could not recall whether defendant looked like a minor on the date of the surveillance and search. *See* R. Doc. No. 59, at 83 ("Q. Okay. Did Mr. Wells at the time or today even look like a juvenile? A. Today -- at that time, I was unsure. It was 5:00 o'clock in the morning.").
[59] R. Doc. No. 59, at 61; *see also* R. Doc. No. 36-3, at 1.
[60] R. Doc. No. 59, at 17–19 (Detective Lewis testifying that he was present for the execution of the warrant and that he himself went into the residence); *see also id.* at

warrant, all four individuals that had been in the residence were detained outside the residence and had been identified.[61] Officers had also already conducted the safety sweep of the residence,[62] but it is unclear whether the "all clear" call was conveyed to Detective Lewis.[63] The long gun was seized during the execution of the search warrant from a bathtub inside the residence.[64]

### c.    *Procedural History*

The indictment charges defendant with one count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).[65] On June 25, 2025, defendant filed a motion to suppress seeking to suppress the firearm seized pursuant to the execution of the search warrant at the residence on January 29, 2021.[66]

---

72–73, 84 (Officer Johnson testifying that the seventh district executed the warrant in connection with the carjacking investigation).

[61] *Id.* at 64, 67 ("THE COURT: . . . to clear things up, at the time the search was executed pursuant to the warrant, you already had identified the persons who were in the house because they were outside the house? THE WITNESS: Yes, sir.").

[62] *See id.* at 84 ("THE COURT: So you didn't do the safety sweep until you had the warrant? THE WITNESS: No, the safety sweep was conducted prior to the execution of the search warrant. THE COURT: Wait. So y'all went into the house before the search warrant was executed? THE WITNESS: To do a safety sweep, yes. So you'll do a call-out. Once you have everybody out, you conduct a safety sweep. And then once Detective Wayne Lewis brought the search warrant on the residence, the Seventh District conducted their search warrant concerning the criminal investigation of the carjacking.").

[63] *Id.* at 89.

[64] *See id.* at 85. It is unclear whether the long gun was located during the safety sweep or the execution of the warrant. *See id.* at 84–85. Either way, Officer Johnson testified that it was only seized upon execution of the search warrant. *See id.* at 85. This is consistent with the police report. *See* R. Doc. No. 36-3, at 4.

[65] *See* R. Doc. No. 1.

[66] *See generally* R. Doc. No. 36.

10

Defendant argues that the search warrant was invalid, and the long gun should be suppressed, because the warrant affidavit was insufficient to establish probable cause.[67] He contends that the good faith exception to the exclusionary rule does not apply, either because the affidavit supporting the warrant is "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,'"[68] (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)), or because the warrant affidavit contains material misstatements and omissions in violation of *Franks v. Delaware*, 438 U.S. 154 (1978).[69] In furtherance of his *Franks* argument that the good faith exception does not apply, defendant also argued that he was entitled to a *Franks* evidentiary hearing because he had made a "sufficient preliminary showing that the affiant officer obtained the warrant by recklessly including material falsehoods in a warrant application."[70]

The government disagreed, arguing that the warrant was valid because the warrant affidavit was sufficient to establish probable cause[71] and it contained no recklessly made false statements or material omissions.[72] In reply, defendant

---

[67] R. Doc. No. 36-1, at 6–8.

[68] *See id.* at 8–9.

[69] *See id.* at 9–13.

[70] *Id.* at 13.

[71] R. Doc. No. 39, at 4 ("The officer writes that officers saw the carjacked vehicle arrive at the residence and then two black males exit[ed] the car armed with assault rifles and enter 3409 Pauger Street. This sentence alone establishes probable for the issuance of a search warrant for the residence."); *see also* R. Doc. No. 60, at 3.

[72] R. Doc. No. 39, at 6 ("The language of the affidavit is clear that the officers did not know if the persons who exited the carjacked vehicle with the assault rifle were [Donovan] and [Rashad]. . . . Nowhere in the affidavit or warrant does the affiant represent to the magistrate that the persons who exited the car were [Donovan] and [Rashad].").

clarified the material misstatements and omissions he was alleging,[73] and he re-urged his request that the Court hold an evidentiary hearing on the motion.[74]

     Defendant identifies three material falsehoods and omissions. First, defendant alleges that the implication that "the warrant was necessary to 'identify and arrest the armed subject[sic] who were in possession of the stolen vehicle,'" is false because, in fact, defendant and Davonn were already outside of the residence and their identities were known by the time the warrant was secured.[75] "Therefore," argues defendant "there was no need to search the [residence] for the so-called 'armed subject.'"[76] Relatedly, defendant alleges that the affidavit "materially omitted the fact that the subjects who entered the house were no longer inside the house, and instead were already in police custody outside on the sidewalk."[77] In essence, defendant argues that these falsehoods and omissions misrepresent the officers' need to enter the residence.[78]

     Second, defendant points out that the warrant states that "two black males exited the vehicle, armed with assault rifles,"[79] which both omits that three people had exited the carjacked vehicle and entered the house, rather than, just the "two

---

[73] *See generally* R. Doc. No. 45.

[74] *Id.* at 6.

[75] R. Doc. No. 36-1, at 12; *see also* R. Doc. No. 45, at 3–4.

[76] R. Doc. No. 36-1, at 12.

[77] *Id.* at 13.

[78] *See* R. Doc. No. 45, at 4 ("In other words, the affiant misrepresented to the magistrate that officers had probable cause to believe Mr. Wells was located inside the house, when in fact they knew that he was not because they had detained him outside the house.").

[79] R. Doc. No. 36-4, at 2 (emphasis added).

black males," and misrepresents that the officers had observed two firearms when, in fact, only one firearm was present.[80] These statements and omissions, argues defendant, "began to misleadingly paint the picture that the affiant had reason to believe that the two black males were Donovan Davis and Rashad Boult, the two individuals sought for a carjacking."[81]

Lastly, defendant argues that the warrant omits "[n]ot only [that] the subjects who entered the house [had] already been identified, but [that] they were identified as people *other than* Donovan Davis and Rashad Boult."[82] In other words, officers "were aware that the individuals who exited the vehicle were not the individuals sought for the carjacking,"[83] but the warrant affidavit "[gave] the impression that the persons could possibly be the 'wanted subjects.'"[84] Defendant argues that "once these misrepresentations and omissions are corrected, the search warrant affidavit fails to establish probable cause."[85]

Agreeing that there was a need for a *Franks* hearing and a hearing on the motion, the Court ordered the parties to appear for the same on August 5, 2025.[86] Detective Lewis and Officer Johnson testified at this hearing.[87] Based on their testimony, the Court determined that it could be helpful to hear from the judge that

---

[80] *See* R. Doc. No. 36-1, at 12.
[81] *Id.*; *see also* R. Doc. No. 45, at 5.
[82] R. Doc. No. 36-1, at 12 (emphasis in original).
[83] *Id.* at 12–13.
[84] R. Doc. No. 45, at 5.
[85] *Id.*
[86] *See* R. Doc. Nos. 46–47.
[87] *See generally* R. Doc. No. 59.

issued the warrant, without concluding at that time whether the testimony could be considered with respect to the motion to suppress.[88] A second hearing was held, over defendant's objection,[89] on August 19, 2025, for the purposes of obtaining Judge Lombard's testimony.[90] At the close of this second evidentiary hearing, the Court ordered the parties to file supplemental briefing to address the evidentiary and legal issues that arose from the hearings.

Defendant and the government timely filed their supplemental briefs on September 2, 2025, and September 9, 2025, respectively.[91] In his supplemental memorandum, defendant re-urges his arguments that the good faith exception does not apply and, separately, argues that suppression of the long gun is required because the warrant's execution was constitutionally defective.[92] The government again argues that the warrant affidavit establishes probable cause and that there were no material omissions or false statements the warrant affidavit because "[t]he information given by [Officer] Johnson to [Detective] Lewis was correct at the time it was given."[93]

---

[88] *See* R. Doc. No. 51.
[89] *See* R. Doc. No. 58, at 7.
[90] *See* R. Doc. Nos. 55–56.
[91] *See* R. Doc. No. 58 (defendant's supplemental memorandum); R. Doc. No. 60 (the government's supplemental memorandum).
[92] *See* R. Doc. No. 58, at 12.
[93] R. Doc. No. 60, at 5.

## II.    STANDARD OF LAW

### a.    *Motion to Suppress*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Herring v. United States*, 555 U.S. 135, 139 (2009) (quoting *Arizona v. Evans*, 514 U.S. 1, 10 (1995)). The U.S. Supreme Court's Fourth Amendment jurisprudence has established "an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *Id.* A party urging a motion to suppress evidence "has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of [their] Fourth Amendment rights." *United States v. Wallace*, 885 F.3d 806, 809 (5th Cir. 2018) (quoting *United States v. Smith*, 978 F.2d 171, 176 (5th Cir. 1992)). Typically, evidence that is seized pursuant to a warrant that is not supported by probable cause, is "subject to the exclusionary rule and may be suppressed to deter future law enforcement misconduct." *United States v. Bell*, 832 F. App'x 298, 300–01 (5th Cir. 2020); *see also United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006).

The good-faith exception states that the exclusionary rule does not apply when an officer obtains evidence in "objectively reasonable reliance on a subsequently invalidated search warrant." *Leon*, 468 U.S. at 922. That inquiry is "confine[d] . . . to 'the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" *United States v. Brown*, 567 F. App'x 272, 281 (5th Cir. 2014) (quoting *Leon*, 468 U.S. at 922 n. 23)). Normally, "a warrant issued by a magistrate . . . suffices

to establish that a law enforcement officer has acted in good faith in conducting a search." *United States v. Morton*, 46 F.4th 331, 336 (5th Cir. 2022) (citation modified).

Where such good faith is shown, the evidence is admissible "even though the affidavit on which the warrant was based was insufficient to establish probable cause." *Pope*, 467 F.3d at 916; *United States v. Moore*, 805 F.3d 590, 593 (5th Cir. 2015) (quoting *Leon*, 468 U.S. at 922) ("The good faith exception provides that if reliance on a defective warrant is 'objectively reasonable,' the Fourth Amendment does not require suppression of evidence obtained pursuant to that warrant."). In fact, a court "need not reach the probable cause issue if the good-faith exception applies, and the case does not involve a 'novel question of law whose resolution is necessary to guide future action by law enforcement officers and magistrates.'" *United States. v. Satterwhite*, 980 F.2d 317, 320 (5th Cir. 1992) (quoting *Illinois v. Gates*, 462 U.S. 213, 264 (1983) (White, J., concurring)); *see also Bell*, 832 F. App'x at 301 ("If a court concludes that the good-faith exception applies, then suppression is inappropriate and it is unnecessary to examine whether probable cause supports the warrant.").

This good-faith exception exists because "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." *Leon*, 468 U.S. at 916. "[W]hen an officer executes a warrant in good faith, the deterrent effect of the exclusionary rule on that officer does not trump the costs of suppressing reliable physical evidence, even if the search is subsequently found violative of the Fourth Amendment." *United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005).

However, there are four recognized situations when a reasonably well-trained officer "would have known that the search was illegal despite the magistrate's authorization." *Morton*, 46 F.4th at 336.

> Reliance on a warrant is unreasonable when: 1) the magistrate issued it based on information the affiant knew was false or should have known was false but for reckless disregard of the truth; 2) the magistrate wholly abandoned the judicial role; 3) the warrant is based on an affidavit so lacking in probable cause as to render belief in its existence unreasonable; and 4) the warrant is facially deficient in particularizing the place to be searched or things to be seized.

*Id.* (citing *Leon*, 468 U.S. at 923); *see also Brown*, 567 F. App'x at 281 ("The good-faith exception does not apply, and the officer may not merely rely on the magistrate judge's determination of probable cause, when the officer does not have reasonable grounds for believing that the warrant was properly issued." (citation modified)).

Defendant raises the first and third limitations to the good-faith exception.[94] The first captures the notion that the good faith exception cannot "protect warrants based on 'deliberately or recklessly false' affidavits," that violate *Franks v. Delaware*. *See United States v. Turner*, 125 F.4th 693, 710 (5th Cir. 2025) (citing *Leon*, 468 U.S. at 914 (quoting *Franks*, 438 U.S. at 165). With respect to the third, defendant contends that the warrant affidavit in this case is "bare bones" and therefore is "so deficient in demonstrating probable cause that it renders an officer's belief in its existence completely unreasonable." *Leon*, 468 U.S. at 923; *United States v. Cutwright*, 247 F. App'x 499, 501 (5th Cir. 2007) (defining "bare bones" affidavits).

---

[94] *See generally* R. Doc. No. 36-1.

b.    *Franks Limitation to the Good Faith Exception*

The *Franks* inquiry "effectively consists of three questions, all of which must be met." *United States v. Ortega*, 854 F.3d at 826 (5th Cir. 2017); (hereinafter, "*Ortega I*"). "First, does the affidavit contain a false statement? Second, was the false statement made intentionally or with reckless disregard for the truth? And third, if the false statement is excised, does the remaining content in the affidavit fail to establish probable cause?" *Id.* (internal citations omitted); *see also United States v. Kendrick*, 980 F.3d 432, 440 (5th Cir. 2020) (applying the three-step inquiry). A warrant "must be voided if the defendant shows by a *preponderance of the evidence* that the affidavit supporting the warrant contained a false statement made intentionally or with reckless disregard for the truth and, after setting aside the false statement, the affidavit's remaining content is insufficient to establish probable cause." *Kendrick*, 980 F.3d at 440 (emphasis added).

False statements for *Franks* purposes include material omissions. *See id.* "To determine whether facts omitted from a warrant affidavit are material to the determination of probable cause, courts ordinarily insert the omitted facts into the affidavit and ask whether the reconstructed affidavit would still support a finding of probable cause." *Kohler v. Englade*, 470 F.3d 1104, 1113 (5th Cir. 2006); *see also Melancon v. Walsh*, No. 24-30232, 2025 WL 429977 (5th Cir. Feb. 7, 2025) (finding the omissions were not material for *Franks* purposes because their inclusion did not undermine probable cause); *United States v. Mueller*, 902 F.2d 336, 342 (5th Cir. 1990) ("[T]he affiant's failure to describe every element of his reasoning process, without more, should not be deemed a material omission.").

If a defendant requests, and is so entitled,[95] a *Franks* evidentiary hearing may be held to establish the first two prongs of the *Franks* inquiry. *Kendrick*, 980 F.3d at 440; *see also United States v. Jordan*, No. 23-205, 2025 WL 1908397, at *3 (N.D. Tex. July 10, 2025) ("The purpose of a Franks hearing is to determine the truthfulness of an affidavit supporting a warrant.").

Applicability of the good faith exception is essentially predicated on the Court's determination, based on the evidence, whether the warrant affidavit included false statements or omissions that were made intentionally or recklessly, rather than in good faith. *See United States v. Arispe*, 328 F. App'x 905, 908 (5th Cir. 2009) ("[The defendant] has not shown that [the affiant] intentionally and/or with reckless disregard for the truth omitted information . . . in his affidavit. The district court did not err in applying the good faith exception and in denying [the] motion to suppress."); *United States v. Hall*, 654 F. App'x 653, 657 (5th Cir. 2016) ("[F]or a false statement to prevent application of the good-faith exception, the statement must be made with the requisite mens rea, i.e., either intentionally or with reckless disregard for the truth.").

In other words, if the defendant cannot meet his burden as to either of the first two *Franks* prongs, the good faith exception applies. *Turner*, 125 F.4th at 710 ("The initial burden is upon the defendant to prove that false information was given intentionally or recklessly.") (citation modified); *see also United States v. Looney*, 532

---

[95] A defendant is entitled to a Franks hearing if he can make "a sufficient preliminary showing that the affiant officer obtained the warrant by recklessly including material falsehoods [and omissions] in a warrant application." *Kendrick*, 980 F.3d at 442.

F.3d 392, 394 (5th Cir. 2008) ("[E]ven if the defendant proves that one or more statements in the affidavit are false, and yet fails to prove that the affiant deliberately or recklessly included such false information in the affidavit, the court may consider the entire affidavit—without any excision—under the good-faith exception to the exclusionary rule."). If the good faith exception does not apply, the Court must proceed to the third prong of the *Franks* inquiry. *See Turner*, 125 F.4th at 712 (holding that "even if the good-faith exception did not apply" the affidavit would still establish probable cause with the false statements excised).

### 1. False Statements or Material Omissions

A statement is not false within the meaning of *Franks* for merely being imprecise, so long as it "reasonably could be read as truthful." *See, e.g.*, *Arispe*, 328 F. App'x at 907 (holding that the statement was not "false," even though the affiant wrote that they saw the defendant with cocaine "inside" his house rather than "outside," because they saw the defendant exit the house and then saw him with the cocaine outside; therefore, it could be inferred that the statement was truthful).

This does not mean that a statement is not false so long as *any* reading renders it true—it must be remembered that affidavits for search warrants are read in a commonsense manner. *See Gates*, 462 U.S. at 238–39. A reading that would stretch the statement beyond a reasonable, common-sense interpretation cannot avoid a determination of *Franks* falsity. *Compare United States v. Namer*, 680 F.2d 1088, 1094 (5th Cir. 1982) ("The affidavit's statement is no less a misrepresentation because it manipulates the facts subtly. By using the word 'classified,' the affiant inaccurately

described what had transpired."), *with Turner*, 125 F.4th at 711 (finding "misleading" but not "false" for *Franks* purposes that the affidavit stated that the officers "were given a key to [defendant's apartment] by one of the occupants" when, in reality, "[t]he officers obtained [the defendant's] keys through a search conducted with [the defendant's] consent").

To that end, a defendant meets his burden when he can show the statement is "clearly false" by a commonsense reading. *See Ortega I*, 854 F.3d at 827 (finding statement that the affiant had worked with an informant "who had previously provided [him] with credible and reliable information" was "clearly false" where the affiant admitted that he had never worked with the informant previously and the informant "spoke mostly in Spanish, a language that [the affiant officer] does not understand"); *see also United States v. Womack*, 675 F. App'x 402, 406 (5th Cir. 2017) (*per curiam*) (finding the affidavit contained false information when it stated that officers had "determined" that an explosive event occurred; although "[t]he scene of the incident strongly suggested the possibility of an explosion. . . . no law enforcement officer ever 'determined' that an explosive event occurred").

### 2. Made Intentionally or with Reckless Disregard for the Truth

To meet the burden as to the second prong, a defendant must show more than mere "negligence or innocent mistake" on the part of the drafting officer. *United States v. Ortega*, 719 F. App'x 319, 324 (5th Cir. 2018) (hereinafter, "*Ortega II*"). With respect to whether a defendant has shown that the false statements were made "intentionally," a court may find that the defendant has not met his burden where he

cannot produce evidence to refute sworn testimony to the contrary. *See, e.g.*, *id.* 324 (finding no clear error where the district court relied on the affiant's testimony that "he believed his affidavit was truthful" and that "[h]e also swore that he did not deliberately misrepresent anything in order to secure a warrant" and made a finding that the statements were not made intentionally); *see also United States v. Gates*, No. 19-237, 2021 WL 3022037, at *4 (E.D. Tex. July 16, 2021).

Similarly, an affiant's testimony with respect to why he wrote the affidavit the way he did may influence whether the Court finds the affiant had the requisite reckless disregard. *See Ortega II*, 719 F. App'x at 326 ("Our cases confirm that the plausibility of the affiant's proffered interpretation weighs in favor of mere negligence and against recklessness."). The more plausible the explanation, the more likely the officer was negligent as opposed to reckless. *See id.* at 325 (finding that the "most natural reading" resulted in a false statement, but nonetheless holding that because the affiant's reading was "not totally baseless" it weighed against a finding of recklessness); *see also Hall,* 654 F. App'x at 658 ("Because we find [the affiant's] explanation that the false statement was a mistake to be plausible, . . . [the affiant's] false statement does not prevent application of the good-faith exception."); *Turner*, 125 F.4th at 711 ("Based on [the] evidence [obtained in the officers' protective sweep], officers reasonably believed that someone in [the defendant's] apartment shot a bullet through the wall, so use of the word 'discovered' is not 'deliberately or recklessly false.'").

The defendant may also demonstrate that the drafting officer had the requisite mental state through circumstantial evidence. For example, if a "cursory review" of the affidavit "may have revealed the falsity," that may lend in favor of a finding that the affiant made the statement recklessly, rather than negligently. *See Ortega I*, 854 F.3d at 829; *Ortega II*, 719 F. App'x at 324 ("[R]ecklessness may be shown circumstantially when reasons to doubt [the] information's veracity are obvious."); *see also United States v. Gaulden,* 587 F. Supp. 3d 375, 401 (M.D. La. 2022), *rev'd on other grounds*, 73 F.4th 390 (5th Cir. 2023) ("[I]t was obvious, and should have been known to [the affiant] at the time that he drafted the affidavit, that the wording of the false statement would cause the issuing judge to draw a false conclusion.").

Furthermore, "a statement or omission's materiality, or lack thereof, has bearing on whether the affiant was reckless." *Ortega II*, 719 F. App'x at 325; *Namer*, 680 F.2d at 1094 ("[T]he analytical concepts of materiality and recklessness are often bound together . . . ."). "The requisite intent [for a *Franks* inquiry] may be inferred from an affidavit omitting facts that are 'clearly critical' to a finding of probable cause." *United States v. Cronan*, 937 F.2d 163, 165 (5th Cir. 1991). The reverse is also true: a fact being immaterial to establishing probable cause weighs in favor of a finding that the affiant made the statement or omission in good faith. *See Ortega II*, 719 F. App'x at 326; *see also United States v. Waguespack*, No. 16-58, 2017 WL 1050580, at *9 (M.D. La. Mar. 20, 2017), *aff'd*, 935 F.3d 322 (5th Cir. 2019) ("As the Government explains, . . . [the affiant] had sufficient information without lying to obtain a search warrant. There is simply no reason for [the affiant] to lie here, and

that too leads the Court to conclude that his error . . . was mere negligence."). Nevertheless, "[t]he fact that probable cause did exist and could have been established by a truthful affidavit does not cure the error." *Ortega I*, 854 F.3d at 829 (quoting *United States v. Davis*, 714 F.2d 896, 899 (9th Cir. 1983)); *Ortega II*, 719 F. App'x at 325 ("[The affiant's] failure to disclose facts underlying conclusory statements in his affidavit is a factor favoring recklessness, though not a dispositive one.").

Courts may also consider the legal knowledge of the drafter and whether exigency or haste surrounded the preparation of the affidavit when determining whether the affiant's misstatement or omission rose to reckless disregard for the truth. *Namer*, 680 F.2d at 1094; *Womack*, 675 F. App'x at 406–07 ("The court should consider the circumstances surrounding the issuance of the warrant when conducting the good-faith inquiry."); *see also id.* (commenting that the affiant did not check the veracity of the information with the officers at the scene before putting the false statement in the affidavit).

*Franks* liability applies "to any officer who has provided information for the purpose of its being included in a warrant application and therefore has assisted in preparing it." *Reitz v. Woods*, 85 F.4th 780, 793 (5th Cir. 2023) (citation modified); *see also Franks*, 438 U.S. at 164 n. 6 ("[T]he Court took as its premise that police could not insulate one officer's deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity.").

24

c.    *Bare Bones Affidavit Limitation to the Good Faith Exception*

The so-called bare-bones-affidavit exception allows courts to apply the exclusionary rule despite the existence of a warrant "when the warrant affidavit is so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *See United States v. Woerner*, 709 F.3d 527, 534 (5th Cir. 2013). In general, "[a]n officer may rely in good faith on the validity of a warrant so long as the warrant is supported by more than a bare bones affidavit." *United States v. Cisneros*, 112 F.3d 1272, 1278 (5th Cir. 1997).

The question for purposes of determining applicability of the good faith exception "is not whether the affidavit ultimately supported probable cause, but whether the officer applying for the warrant was 'entirely unreasonable' in believing that the affidavit supported probable cause." *United States v. Gonzalez*, 766 F. App'x 178, 182 (5th Cir. 2019) (quoting *Leon*, 468 U.S. at 923); *see also United States v. Devaney*, 109 F.4th 322, 326 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 1183 (2025) ("[A]n affidavit is not bare bones merely because it fails to establish probable cause."); *see also id.* at n. 1 ("Indeed, an affidavit—though presenting an impartial magistrate with a 'close call' on probable cause—may nonetheless be 'far from bare bones.'" (quoting *Morton*, 46 F.4th at 338)).

Bare bones affidavits "do not detail any facts, they allege only conclusions." *Morton*, 46 F.4th at 337 (citation modified). These affidavits "lack the facts and circumstances from which a magistrate can independently determine probable cause." *United States v. Norman*, 129 F.4th 874, 876 (5th Cir. 2025). Typical examples include affidavits "that merely state that the affiant 'has cause to suspect and does

25

believe' or '[has] received reliable information from a credible person and [does] believe'" that evidence of a crime is located on the premises to be searched. *See Pope*, 467 F.3d at 920; *Brown*, 567 F. App'x at 281; *see Morton*, 46 F.4th at 337 ("In what we described as a textbook example of a facially invalid, barebones affidavit, the officer listed just the defendant's biographical and contact information and then stated nothing more than the charged offense, accompanied by a conclusory statement that the defendant committed that crime." (internal quotations omitted)).

### d.    *Probable Cause*

"Probable cause exists when there are reasonably trustworthy facts which, given the totality of the circumstances, are sufficient to lead a prudent person to believe that the items sought by the warrant constitute fruits, instrumentalities, or evidence of a crime." *Kendrick*, 980 F.3d at 440 (citation modified). The probable cause determination is a "practical, common-sense decision" that, based on the warrant affidavit, "there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Ortega I*, 854 F.3d at 828 (citation modified). That is, there must be some nexus between the place to be searched and the items to be seized or the criminal activity being investigated. *Brown*, 567 F. App'x at 282 ("Facts in the affidavit must establish a nexus between the house to be searched and the evidence sought.").

This nexus "may be established through direct observation or normal inferences as to where the articles sought would be located." *See Moore*, 805 F.3d at 593 (citation modified); *see also United States v. Wilson*, No. 25-30105, 2025 WL

2490719, at *4 (5th Cir. Aug. 29, 2025). However, without a reasonable inference that the evidence sought is the type normally kept at home, probable cause to believe a person has committed a crime does not translate to probable cause to believe evidence of illegal activity is within a person's home. *Wilson*, 2025 WL 2490719, at *5 ("[A] specific nexus must be shown before officers may assume that contraband or instrumentalities of crime are kept at a residence."); *see also Brown*, 567 F. App'x at 282 (finding no nexus to search defendant's house where the defendant was the subject of an ongoing investigation but was found with drugs during a traffic stop) ("[T]he affidavit provided no information linking the drug-trafficking investigation to [the defendant's] residence.").

"Probable cause does not require proof beyond a reasonable doubt, but only a showing of the probability of criminal activity." *Devaney*, 109 F.4th at 326. A court determining probable cause should consider whether probable cause exists when considering the totality of the circumstances, rather than any fact in isolation. *See Wilson*, 2025 WL 2490719, at *7 ("Probable cause exists when under the 'totality of the circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"); *see also United States v. Nagy*, No. 11-646, 2012 WL 12877951, at *4 (W.D. Tex. Jan. 27, 2012), *aff'd*, 524 F. App'x 958 (5th Cir. 2013) ("While some of these facts, standing alone, were not necessarily indicative of illegal activity, in combination they gave rise to a fair probability that contraband or evidence of a crime would be found at [the searched residence.]" (internal alterations omitted)).

As is relevant to this case, if the Court finds that defendant has met his burden of proof with respect to the first two *Franks* prongs, the probable cause determination is made by "excising the alleged falsehoods and omissions and inserting the improperly omitted context." *Kendrick*, 980 F.3d at 442.

## III.    ANALYSIS

The Court must first determine whether the good faith exception applies. *Turner*, 125 F.4th at 71. If the Court finds that defendant has met his burden under *Franks*, then the good faith exception will be inapplicable, and the Court need not consider defendant's invocation of the "bare bones" affidavit limitation.[96] Additionally, whether defendant has met his burden with respect to *Franks* also dictates which statements or omissions should be considered for purposes of the probable cause analysis. *See Kendrick*, 980 F.3d at 442. The Court will therefore first address whether defendant has met his burden pursuant to *Franks*.

---

[96] A cursory review of the warrant affidavit, however, reveals that it is likely not bare bones. Although it does not contain many facts, the Court cannot say it "do[es] not detail *any* facts" or that it "allege[s] *only* conclusions." *Norman*, 129 F.4th at 876 (emphasis added); *see also Devaney*, 109 F.4th at 326 ("[A]n affidavit *is not* bare bones merely because it fails to establish probable cause. Rather, the term describes only those affidavits that 'contain *wholly* conclusory statements'—i.e., those that are completely devoid of 'the facts and circumstances from which a magistrate can independently determine probable cause.'" (emphasis in original)). Furthermore, while the facts in the warrant affidavit demonstrating a nexus are sparse, they are not, as defendant contends, *see* R. Doc. No. 36-1, at 9, so absent as to render the officers "'entirely unreasonable' in believing that the affidavit supported probable cause." *Gonzales*, 766 F. App'x at 182; *see also Devaney*, 109 F.4th at 326 ("[A]n affidavit is not bare bones merely because it fails to establish probable cause.").

a.    *Franks*

### 1. False Statements and Material Omissions

Based on the evidence presented at the hearing, defendant has established that the affidavit contained false statements and material omissions. Officer Johnson testified that he never saw more than one firearm possessed by the two individuals observed with the carjacked vehicle.[97] Therefore, the statement in the warrant affidavit that two individuals were "armed with assault *rifles*" is clearly false. *See Ortega I*, 854 F.3d at 827. Defendant has also demonstrated, by a preponderance of the evidence, that officers observed a third person—the pregnant woman—exit the vehicle when it "arrived at the residence at approximately 6:30 A.M."[98] and that the affidavit omitted the same.

A slightly more difficult question is posed by the statements and omissions that relate to facts that changed over the course of that morning. For example, the statement in the warrant affidavit that the "affiant is requesting a search warrant of the residence to identify and arrest the armed subject[sic] who were in possession of the stolen vehicle, to determine if the wanted subjects are occupied within" was true at one point that morning and was true "at the time it was given" to Detective Lewis. However, the statement became false once defendant and Davonn were outside the residence and had been identified. Once defendant and Davonn were outside the residence and identified, the statement became false because there was no need to enter the residence "to identify" the wanted persons "who were in possession of the

---

[97] *See, e.g.*, R. Doc. No. 59, at 63.
[98] R. Doc. No. 36-4, at 2.

stolen vehicle."[99] The same is true of the statement that the warrant was also needed "to determine if the wanted subjects are occupied within." While this statement "reasonably could be read as truthful"[100] at one point that morning—the wanted subjects could have ignored the call out and remained in the residence—that

---

[99] The Court recognizes that the alleged falsehood *cannot* be that the affiant represented a false or pretextual purpose for obtaining the warrant. *See United States v. Morton*, 46 F.4th 331, 336 (5th Cir. 2022). The Fifth Circuit rejected this argument in *Morton*:

> The alleged falsehood is keeping from the magistrate that the affiant's motive was not obtaining evidence of drug crime but investigating suspicions that [the defendant] was a sexual predator. In other words, [the defendant] is arguing that the reason for obtaining the warrant was pretextual. Even if [the defendant] could prove this motive, it would not matter. The Supreme Court has repeatedly held that the Fourth Amendment inquiry, including the existence of probable cause, is objective.

*Id.* at n. 2. But this is not the argument defendant makes. Instead, the Court understands defendant's argument to be that this statement implies the fact that the persons viewed in possession of the carjacked vehicle were inside the house, which, at some point, is factually false. *Compare Namer*, 680 F.2d at 1094 ("The affidavit's statement is no less a misrepresentation because it manipulates the facts subtly. By using the word 'classified,' the affiant *inaccurately described what had transpired*." (emphasis added)), *and Ortega I*, 854 F.3d at 827 (holding a statement was false because "a plain reading of the statement in the affidavit implie[d]" facts which were not true), *with Turner*, 125 F.4th at 711 (finding "misleading" but not "false" for Franks purposes that the affidavit stated that the officers "were given a key to [defendant's apartment] by one of the occupants" when, in reality, "[t]he officers obtained [the defendant's] keys through a search conducted with [the defendant's] consent") *and Reitz*, 85 F.4th at 793 (upholding the district court's finding that the officer's statement that "[i]t *appears* that the recorded calls are from the same person" was not false because it was "phrased as his subjective impression" (emphasis in original)) ("These are not misstatements, but qualified statements that do not give rise to *Franks* liability.").

[100] *Arispe*, 328 F. App'x at 907.

statement became false once officers conducted the safety sweep and were "confident that nobody else was in the house."[101]

This temporal elemental also plays a role in the alleged material omissions. The information that was omitted—namely, that the persons observed inside and outside the carjacked vehicle were already outside the residence and had been identified as *not* being the suspects wanted for the carjacking—developed over the course of that morning, after Officer Johnson had called Detective Lewis for the purposes of obtaining the search warrant. The question, then, is at what point should a statement or omission be evaluated for falsity or materiality?

The Fifth Circuit addressed a similar question in *Thomas v. Williams*, 719 F. App'x 346 (5th Cir. 2018). In that case, the Fifth Circuit evaluated whether an officer, for purposes of qualified immunity, had violated *Franks* when he included in the warrant affidavit information that he later learned was false. *See id.* Relying on the

---

[101] *See* R. Doc. No. 59, at 88. The long gun was seized during the execution of the search warrant and not during the safety sweep, so the Court need not address whether the safety sweep was lawful. *See Turner*, 125 F.4th at 709; *see also id.* at n. 65 ("Since no evidence was seized in the second search, and since it did not in any way affect petitioner's trial so far as the record discloses, there is no occasion to consider its propriety." (quoting *Chimel v. California*, 395 U.S. 752, 775 n.6 (1969) (White, J., dissenting)). Still, any limited search of the residence conducted for the safety of the officers must be "supported by a reasonable, articulable suspicion that the area to be swept harbors an individual posing a danger to those on the scene." *See id.* at 708. It is questionable whether a protective sweep was justified in this case. *See* R. Doc. No. 59, at 80 (Officer Johnson testifying that he and Officer Ogden had asked the individuals detained outside the residence if there were other people in the residence); *see also United States v. August*, 136 F.4th 595, 602 (5th Cir. 2025) ("Case law tends to reflect that exigent circumstances [justifying a safety sweep] are unlikely to exist if there is no articulable reason to believe that someone else might be inside the residence." (internal alterations and quotations omitted)).

premise dictated by the U.S. Supreme Court in *Maryland v. Garrison* that "items of evidence that emerge after the warrant is issued have no bearing on whether or not a warrant was validly issued," the Fifth Circuit held that the officer had not violated *Franks* because he had only learned that the information was false after the warrant was issued. *See Thomas*, 719 F. App'x at 350 (quoting *Maryland v. Garrison*, 480 U.S. 79, 85 (1987)).

> The [plaintiffs] rely only on observations that [the officer] made during the course of executing the warrant, not facts [the officer] was actually aware of when he submitted his probable cause affidavit to the judge. Because the [plaintiffs] do not present any evidence that [the officer] knew the statements were false or acted with reckless disregard for the truth *at the time he swore the affidavit*, the district court properly held that [the officer] was entitled to qualified immunity.

*Id.* at 351 (emphasis in original). *Thomas* directs the Court to consider the misstatements and omissions of the affidavit against what was known by the officers at the time the affidavit was sworn. *Cf. Maryland*, 480 U.S. at 85 (finding that to determine the constitutionality of the execution of a search warrant, the court "must judge the constitutionality of [the officers'] conduct in light of the information available to them at the time they acted"); *see also id.* ("The validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate.").

As was illuminated by the timeline developed at the hearing, the following information came to light *before* the warrant was issued: the identities of the two individuals that were seen inside the carjacked vehicle and possessing the firearm; the fact that those two individuals were not the subjects wanted for the carjacking;

32

and that the wanted subjects—Rashad and Donovan—were not inside the residence. Importantly, this information was known by Officer Johnson before the warrant was signed by Detective Lewis or presented to Judge Lombard.[102] The fact that the information was true when Officer Johnson conveyed it to Detective Lewis may weigh against a finding of recklessness, but it does nothing to affect what had objectively transpired by the time the affidavit was sworn. *See Gaulden*, 587 F. Supp. 3d at 402 (finding the officer was reckless because "a plain reading of [the misstatement] [was] extremely misleading insofar as it would lead the issuing judge to have a woefully incorrect understanding of the facts"); *Namer*, 680 F.2d at 1094 ("The affidavit's statement is no less a misrepresentation because it manipulates the facts subtly. By using the word 'classified,' the affiant inaccurately described what had transpired."). A plain reading of the affidavit misconstrues the facts as they were at that time, and therefore, these statements and omissions are false for *Franks* purposes. *See Ortega I*, 854 F.3d at 827. Consequently, the Court finds that defendant has met his burden of establishing that the warrant affidavit contained false statements and omissions.

## 2. Intent or Recklessness

Next the Court must determine whether defendant has presented sufficient evidence to show that these false statements and omissions were made intentionally or with reckless disregard for the truth. *Franks* liability attaches to both Detective Lewis, as the person who prepared and signed the warrant affidavit, as well as Officer

---

[102] Recall that defendant was arrested at 7:30 A.M., meaning, he was outside the residence and identified by 7:30 A.M. at the latest. Detective Lewis signed the warrant affidavit at 7:50 A.M. *See* R. Doc. No. 36-4, at 2.

Johnson, as the person who supplied information to him for the purpose of inclusion in the warrant affidavit. *See Hughes v. Garcia*, 100 F.4th 611, 620 (5th Cir. 2024); *Reitz*, 85 F.4th at 793. Having questioned and listened to both officers' testimony at the hearing, the Court finds that the evidence demonstrates that their collective preparation of the warrant affidavit was reckless with respect to the statements indicating the need to enter the residence and the omission of the information obviating that need.

Beginning with Detective Lewis, the uncontested facts establish that he was not on the scene and was relying wholly on the information provided by Officer Johnson to draft the warrant. He never followed up with Officer Johnson at any point from when he received the call—sometime before 7:30 A.M.—to when he finalized the warrant affidavit at 7:50 A.M. He also knew that a perimeter was being set up around the residence in order to "attempt to take [the individuals] down," but never called Officer Johnson to discover if any new information had been acquired as a result of that perimeter.

The Fifth Circuit's *per curiam* decision in *United States v. Womack* found it a "close question" whether the affiant had acted recklessly when faced with similar facts. *See* 675 F. App'x at 407. Like Detective Lewis, the affiant in *Womack* was "not at the scene of the investigation and relied on information . . . provided to him" by another officer involved in the investigation and had drafted the affidavit "while the investigation was ongoing." *See id.* ("While he was drafting the affidavit, [the affiant]

never checked with the agents at the scene of the crime and relied solely on [the officer's] uncorroborated assessment of the situation.").

However, unlike Detective Lewis, the affiant in *Womack* "was a licensed attorney and perhaps should have appreciated the importance of his language before presenting the affidavit to the magistrate judge." *Id.* Another notable difference from *Womack* is that Detective Lewis was not involved in the investigation aside from being the "on-call" detective that drafted the warrant affidavit. *See id.* at 403. His explanation that he drafted the warrant affidavit with exactly the information relayed to him from Officer Johnson without further question is therefore more plausible. *See Hall*, 654 F. App'x at 658 ("Because we find [the affiant's] explanation that the false statement was a mistake to be plausible, . . . we conclude that [the affiant's] false statement does not prevent application of the good-faith exception."). In addition, even though Detective Lewis knew a perimeter was being set, it is unclear whether he knew that the officers were going to call the individuals out of the residence.[103]

Because the Fifth Circuit "pretermit[ted] any holding as to whether the good-faith exception applie[d]" on similar facts in *Womack*, *see id.* at 407, and because other factors are present here that militate against a finding of recklessness, the Court finds that defendant has not met his burden of demonstrating that Detective Lewis acted recklessly. But Detective Lewis did not draft alone. *See Franks*, 438 U.S. at 164 n. 6 ("[T]he Court took as its premise that police could not insulate one officer's

---

[103] *See* R. Doc. No. 59, at 32.

deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity.").

Officer Johnson played an essential role in the drafting of the warrant, and in that role he was reckless. Officer Johnson knew Detective Lewis was relying on the facts he had told him to establish probable cause in the warrant affidavit,[104] yet his own testimony establishes that he made "no effort" to update Detective Lewis at any point,[105] even as the circumstances materially changed. When the Court asked why, his only explanation was that he was focused on the furtherance of the fugitive investigation and not the carjacking:

> THE COURT: So the statement here that the search warrant was needed to identify the persons who are the armed subject[s], that really wasn't the case by the time the search warrant was signed because of the fact you already knew who the persons were inside the house?
>
> THE WITNESS: Yes, sir.
>
> THE COURT: So did you think about calling Detective Lewis and say, "Hey, by the way, no matter what we said on the phone earlier, that we now know who these people in the house were, and we don't need the search warrant for that specific purpose"? You understand what I'm saying?
>
> THE WITNESS: Yes, sir. But no, that didn't come to mind.
>
> THE COURT: How come?
>
> THE WITNESS: Because we were still actually working the fugitive investigation that brought us there in the first place.[106]

---

[104] *Id.* at 67 ("Q. And you were aware that Detective Lewis was relying on your information in terms of obtaining that warrant; right? A. Yes, I knew he was getting a search warrant based upon the information that was relayed to him when we got on scene after what we observed being there.").

[105] *Id.* at 69.

[106] *Id.* at 64–65.

Still, Officer Johnson was aware that the information he provided to Detective Lewis was also going to serve as the basis for probable cause to search the house for evidence of the carjacking:

> THE COURT: So how would – even if they had a rifle, how would you believe that there's probable cause to believe that the rifle was evidence of a carjacking?
>
> THE WITNESS: I guess I don't know how to answer the question. I wasn't conducting the criminal investigation into the carjacking. That information was relayed to the Seventh District where the carjacking occurred. That was their portion of the investigation. We were mainly there to attempt to do the fugitive apprehension or investigation, and this ended up spinning out off of that.
>
> THE COURT: But you wanted a search warrant? You were the one that gave the information to get a search warrant; right?
>
> THE WITNESS: Yeah, you pass that information on to the district of occurrence . . . which ended up being the Seventh District . . .
>
> * * *
>
> THE COURT: Did you say [to Detective Lewis that] there was any other reason to get – there was any other evidence in the house that you wanted to get?
>
> THE WITNESS: For us, no. We weren't concerned about the evidence, but that information is relayed to them to have.[107]

It is of no consequence that Officer Johnson was "just doing the fugitive investigation portion" of the investigation.[108] He was reckless to initiate acquisition of a search warrant for the residence and then not update the affiant when it became obvious that the information that he had provided to establish probable cause was no longer

---

[107] *Id.* at 74.
[108] *Id.* at 71.

accurate. *See United States v. Osterman*, 119 F.4th 1090, 1095–96 (7th Cir. 2024),
*cert. denied*, 145 S. Ct. 1435, 221 L. Ed. 2d 557 (2025) (finding clear error when the
district court had held an officer was not reckless for failing to update the warrant
affidavit with accurate information) ("[I]t is evident [the detective] acted recklessly
in refusing to update the warrant once he knew [the accurate information]. He
admitted that . . . he could have updated the affidavit since he had the accurate
information before renewing the warrant. When an officer continues a course despite
having 'serious doubts as to the truth' or 'obvious reasons to doubt' the accuracy of
his assertions, that is a reckless disregard for the truth."). This is particularly true
where no exigent circumstance prevented Officer Johnson from calling; all persons
were detained in handcuffs outside, and the safety sweep had confirmed that there
was no risk of other individuals exiting the residence.[109] *See Namer*, 680 F.2d at 1094.
The Court therefore finds that Officer Johnson was reckless in not correcting his
misstatements and failing to update Detective Lewis with the new material
information known to him, thereby omitting material information from the warrant
affidavit.

---

[109] The Court is unpersuaded by the government's claim that exigent circumstances
were present because officers were "confronted with a chaotic scene" when the
pregnant woman "exited the residence, . . . half-naked and experiencing a mental
health crisis." R. Doc. No. 60, at 6. While officers were undoubtedly "trying to control
an additional situation at that time," *see id.*, this does not excuse Officer Johnson's
failure to even try and update Detective Lewis during the approximately hour-long
wait for the search warrant, particularly, because at some point a different officer
relocated the woman to a hospital, *see* R. Doc. No. 59, at 81.

That being said, the evidence is insufficient to demonstrate recklessness with respect to the other misstatements and omissions. For example, the evidence does not reveal whether Officer Johnson accurately conveyed to Detective Lewis how many firearms were present or that a third person had exited the carjacked vehicle.[110] Nor does the evidence reveal whether Detective Lewis had accurately heard this information and merely forgot to include it or included it inaccurately when transcribing it to the affidavit. Detective Lewis claimed numerous times during his testimony that he wrote in the affidavit exactly what Officer Johnson told him over the phone, but Officer Johnson testified that much of the warrant's wording was Detective Lewis's own, and that he had no part in crafting the warrant aside from "relay[ing] . . . that a search warrant can be conducted at the location."[111]

Regardless of whether the above-cited facts were accurately communicated or lost in translation, any misrepresentation with respect to such facts was unintentional and a result of hasty communication and affidavit drafting in the course of an active investigation. *See Namer*, 680 F.2d at 1094 (contrasting a situation where the affidavit was drafted "during the course of a lengthy investigation at a time when [the officers] were not beset by any exigent circumstances"); *see also United States v. Beard*, No. 18-CR-00601, 2019 WL 2161038, at *10 (S.D. Tex. May 17, 2019), *aff'd*, 16 F.4th 1115 (5th Cir. 2021) ("[I]f there is a rule it is that negligent or unintentional typographical errors are not grounds for excising the sentences . . . ").

---

[110] R. Doc. No. 59, at 52–54.
[111] *Id.* at 69.

And as will be demonstrated below, the presence or lack of a second firearm and a third person are not central to a finding of probable cause, which supports a finding of negligence rather than recklessness with respect to these misstatements and omissions. *Ortega II*, 719 F. App'x at 325 ("[A] statement or omission's materiality, or lack thereof, has bearing on whether the affiant was reckless."); *United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980) ("[T]hese facts were not so central as to warrant the inference that [the affiant's] actions were reckless. For this reason, we hold that [the defendant] failed to carry his burden of showing that the omissions were more than negligent.").

Nevertheless, because the Court finds that defendant has met his evidentiary *Franks* burden with respect to the false statements and omissions previously identified, the good-faith exception is inapplicable and the Court proceeds to the probable cause analysis with such material statements and omissions excised. *See Turner*, 125 F.4th at 712.

b.  *Probable Cause*

Having determined that defendant has met his burden of establishing that the affidavit contained recklessly made false statements and omissions, the Court must next determine whether the affidavit—without the false statements and with the improperly omitted context—supports probable cause. *See Kendrick*, 980 F.3d at 442; *see also Hughes*, 100 F.4th at 620 ("Franks requires courts to conduct a 'corrected affidavit' analysis. Courts must consider whether the warrant affidavit would support

40

probable cause if the misstatements and material omissions were eliminated."
(internal citations omitted)).

With the affidavit corrected, what is left? The corrected affidavit would now
read:

> WHERE THE FOLLOWING DESCRIBED ITEM(S) IS/ARE
> BELIEVED TO BE LOCATED:
>
> Your affiant is requesting a search warrant of the residence to ~~identify
> and arrest the armed subject who were in possession of the stolen
> vehicle, to determine if the wanted subjects are occupied within and to~~
> collect any and all evidence relative to an armed robbery which include
> but are not limited to firearms, holsters, ammunition, vehicle keys, key
> fobs, and electronic communication devices.[112]
>
> * * *
>
> PROBABLE CAUSE IS BASED ON THE FOLLOWING FACTS:
>
> On Friday, January 29, 2021 , N.O.P.D. Violent Offender Warrant
> Squad, conducted surveillance at 3409 Pauger Street for wanted
> subjects Donovan Davis (b/m, [REDACTED]) and Rashad Boult (b/m
> [REDACTED]) who committed an armed carjacking under N.O.P.D.
> Item # A-32581-21, in which a silver 2008, four door Honda Civic,
> bearing Mississippi License plate JGD12160, was stolen. The officers
> observed the vehicle arrive at the residence at approximately 6:30 AM
> and two black males exited the vehicle, armed with assault rifles and
> entered apartment B of 3409 Pauger Street.[113]

Critically, the warrant would now include that these two men had been identified and
were not the wanted subjects. The warrant would also explain that officers had
confirmed from a safety sweep of the residence that the wanted subjects were not
located inside. For obvious reasons, this is not enough to establish probable cause to

---

[112] *See* R. Doc. No. 36-4, at 1.
[113] *Id.* at 2.

search the residence for the wanted subjects. But it is also not enough to establish probable cause to search the residence for evidence of the carjacking.[114]

Considered on its face, including the material omissions and excising the material falsehoods, the warrant does not sufficiently connect defendant and Davonn to the carjacking or, crucially, any evidence of the carjacking to the residence. *Brown*, 567 F. App'x at 282 ("Facts in the affidavit must establish a nexus between the house to be searched and the evidence sought."). The Court disagrees with the government that the sentence indicating that "the officers saw the carjacked vehicle arrive at the residence and then two black males exit the car armed with assault rifles and enter 3409 Pauger Street,"[115] is enough, by itself, to establish a nexus to the residence.[116]

Once the affidavit makes clear that defendant and Davonn are not the ones wanted for the carjacking, the only fact connecting them to the carjacking is their possession of the carjacked vehicle. And while one might infer guilty association with a carjacking from possession of the carjacked vehicle, that inference is necessarily weakened the further the act of possession is from the date that the carjacking occurred. *Cf. Welch v. United States*, 386 F.2d 189, 189 (5th Cir. 1967) (finding that the defendant's possession of a stolen vehicle on the day after it was stolen was sufficient to establish knowledge that the vehicle was stolen for purposes of his conviction of "receiving and selling a stolen vehicle") ("[K]nowledge may be

---

[114] *See* R. Doc. No. 60, at 4 (the government arguing that "[t]he warrant was not limited to only learning the identities of the two males").

[115] R. Doc. No. 39, at 4.

[116] *See id.* ("This sentence alone establishes probable [cause] for the issuance of a search warrant for the residence.").

established by circumstantial evidence and that possession of a stolen vehicle *recently after its theft* justifies the inference that the possession is guilty possession." (emphasis added)).

The government contends that the temporal proximity of the underlying carjacking to the officers' observation of defendant in possession of the vehicle and firearm is established by the N.O.P.D. item number in the warrant affidavit.[117] The warrant states that the carjacking being investigated is listed under N.O.P.D. item number A-32581-21.[118] Detective Lewis testified that the "A" in the item number corresponds to the month, "January," and that the "21" connotes the year, "2021."[119] He also testified that the middle number, 32581, reflects "calls of service in that month," and therefore likely "indicates [that the carjacking was] closer to the end of the month," but it is not attributable to a specific date in that month.[120] Judge Lombard testified that this was her understanding of the N.O.P.D. item number as well,[121] meaning she knew that the carjacking occurred in January 2021,[122] the same month and year that defendant was seen in possession of the carjacked vehicle and a firearm. Accordingly, proffers the government, "Judge Lombard made a reasonable inference that the carjacking occurred in January 2021, because she knew the Item

---

[117] *See* R. Doc. No. 60, 6–8.
[118] R. Doc. No. 36-4, at 2.
[119] R. Doc. No. 59, at 22.
[120] *Id.*
[121] R. Doc. No. 60-1, at 8.
[122] *Id.* at 9.

number in the warrant was issued in January 2021."[123] And therefore, the affidavit contained the information that would allow a judge to determine that probable cause existed.

Defendant, instead, maintains that probable cause is a "question of law" and that "review of the sufficiency of the evidence supporting probable cause is limited to the information presented in the four corners of the affidavit."[124] Because Judge Lombard's "interpretation of what the item number represents is not contained within the affidavit itself," argues defendant, her testimony should not be considered and, instead, the Court should determine probable cause itself.[125] The Court agrees with defendant.

"Given that the state magistrate judge did not actually consider the excised affidavit," the proper procedure is to "proceed 'somewhat hypothetically' in determining whether the remaining content in the affidavit establishes probable cause." *Ortega I*, 854 F.3d at 828. To import either Judge Lombard's or Detective Lewis's testimony would be akin to the Court introducing new facts to the affidavit, which it may not do.[126] *See Brown*, 567 F. App'x at 283 ("Probable cause must be

---

[123] R. Doc. No. 60, at 7–8 (arguing that "[t]he Fifth Circuit has routinely held that judges are permitted to make reasonable inference from affidavits when issuing warrants" (citing *Norman*, 129 F.4th at 875)).

[124] R. Doc. No. 58, at 20–21 (quoting *United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006)).

[125] *Id.* at 21–22.

[126] The Court notes that Judge Lombard testified that her understanding of the N.O.P.D. item number comes both from her fifteen years of experience signing and issuing warrants as a judge as well as from her career as a criminal defense attorney prior to becoming a judge. *See* R. Doc. No. 60-1, at 8–9. The Court cannot conclude from Judge Lombard's testimony that another issuing judge, one without prior

established in the affidavit and evidence presented to the magistrate; an 'otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but not disclosed to the issuing magistrate.'"); *United States v. Wooldridge*, No. 15-18, 2016 WL 11473559, at *5 (E.D. Tex. Apr. 22, 2016), *report and recommendation adopted*, No. 15-18, 2016 WL 2892529 (E.D. Tex. May 17, 2016) ("When oral testimony is not presented and the issuing judge relies solely on a supporting affidavit to issue a search warrant, as is the case here, the existence of probable cause to support a warrant must be ascertained exclusively from the four corners of the affidavit." (citation modified)).

Without the testimony interpreting the N.O.P.D. item number, the face of the warrant lacks any indication as to when the carjacking occurred. So, any probative value that the date could have provided is of no consequence to this Court's probable cause analysis. In fact, even if the information within the four corners of the warrant could create a stronger inference of guilt by demonstrating that the possession was recent, that does not necessarily translate to probable cause to search *the residence* for evidence of the carjacking generally. *Cf. Wilson*, 2025 WL 2490719, at *4 (holding that "probable cause to arrest is not probable cause to search" that person's home).

"Probable cause may be established through 'direct observation' or 'normal inferences as to where the articles sought would be located.'" *Moore*, 805 F.3d at 593. With respect to the evidence sought in the search warrant that was not directly

---

criminal defense experience and/or significant judicial experience, would be privy to the same understanding of the N.O.P.D. item number.

observed by the officers—namely, "vehicle keys, key fobs, and electronic communication devices"—the affidavit provides nothing to support an inference that this evidence will be located inside the residence. The warrant affidavit does not, for example, assert that evidence of a carjacking is of the type normally kept at home. *See id.* ("To be sure, some items 'one would normally expect' to be kept at home—such as mail, passports, or bank records—may justify a residential search. But the 'the notion that 'few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime' does not provide carte blanche for searching a home when one is suspected of illegal activity.'"); *but see Bell*, 832 F. App'x at 302 (finding sufficient nexus to home where the affidavit relied on inferences that drug traffickers are likely to keep contraband within their residence). And the government cites no case supporting such an inference.

The mere observation of the carjacked vehicle outside of the residence is not enough to infer that evidence of the carjacking will be located *inside the residence*. *See Lange v. California*, 594 U.S. 295, 303 (2021) ("Freedom in one's own dwelling is the archetype of the privacy protection secured by the Fourth Amendment; conversely, physical entry of the home is the chief evil against which it is directed." (internal alterations and quotations omitted)); *see also Brown*, 567 F. App'x at 283 ("Probable cause exists when under the 'totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found *in a particular place*. (emphasis in original) (internal alterations omitted)).

Without a temporal connection between the carjacking and their possession of the carjacked vehicle, there is little in the corrected affidavit to corroborate a belief that the individuals seen entering the residence were engaged in criminal activity, much less that evidence of criminal activity was to be found therein. *Cf. Moore*, 805 F.3d at 595 (finding sufficient nexus between the defendant's residence and evidence located outside the residence in communal trash receptacle where synthetic cannabinoid "roaches" and "mail addressed to [the defendant's] residence" were found together in a trash bag, and where "the affidavit included details about security cameras at the apartment and [the defendant's] previous drug convictions. Those facts corroborated the belief that [the defendant] *was engaged in criminal activity at his residence* and are relevant in determining the existence of probable cause" (emphasis added)); *see also United States v. Robinson*, No. 22-30269, 2023 WL 1466617, at *2 (5th Cir. Feb. 2, 2023) (suggesting that an affidavit would be insufficient to establish a nexus between a car containing contraband and a residence "[i]f the affidavit mentioned only the [car's] one-time location in front of the residence" (emphasis omitted)). This is particularly true considering, as the corrected affidavit would include, that the two individuals seen in possession of the carjacked vehicle were confirmed as not being wanted for the carjacking.

Put simply, possession of a carjacked vehicle and its presence outside of a residence, without more, is not enough to expect that evidence of that carjacking will be located inside of that residence. *See United States v. Kafuku*, 357 F. Supp. 3d 1164, 1177 (D. Utah 2018) ("The only connection was that officers saw one of the drivers [of

the stolen vehicle] enter the . . . apartment on multiple occasions and that they saw the driver carrying the keys. . . .While the magistrate could have concluded the keys would be in the [apartment], there is no basis upon which he could conclude probable cause existed for the belief that any other evidence of the purported crime would be found there.").[127]

Nor can the officers' "direct observation" of defendant carrying the firearm into the residence create a sufficient nexus where there is no temporal link between the carjacking and defendant's possession of the firearm and carjacked vehicle. *Moore*, 805 F.3d at 593. The firearm loses any probative weight in favor of searching the residence when there is nothing to connect it to the carjacking or any other wrongdoing. Possession of a firearm alone cannot justify a search of a person's home where there are no "facts [in the affidavit] from which [the reviewing judge] could infer that the firearm was contraband, that it had been used in a crime, and/or that it was linked to any wrongdoing." *Wooldridge*, 2016 WL 11473559, at *5 ("Indeed, the affidavit provides no facts connecting Defendant's use of the firearm to any alleged crime and/or illegal activity."); *cf. United States v. Wilson,* 143 F.4th 647, 653 (5th

---

[127] As defendant points out in his supplemental memorandum, whether there was probable cause to believe that the keys were in the residence, also "depended, of course, on whether that evidence had already been located on the driver's or passenger's person when they were called out and detained." *See* R. Doc. No. 58, at 19. The evidence before the Court does not establish whether the keys to the carjacked vehicle were located on defendant or Davonn. However, any inference that could have been made that the keys were located inside the residence is weakened because the affidavit does not state that any keys were observed being carried by either person or that either of the two males that "exited the vehicle" were driving the carjacked vehicle when it "arrive[d] at the residence." *See* R. Doc. No. 36-4, at 2.

Cir. 2025) ("The mere fact that a citizen carries a firearm does not create reasonable suspicion that he committed a crime."). Although it was later established that defendant's possession of the firearm amounted to criminal wrongdoing due to his criminal history status, there is nothing in the warrant to indicate defendant's possession was illegal.

As the Court captured during its questioning of Officer Johnson at the hearing, "once you knew that the people in the house were not the wanted persons for the carjacking, what would make you believe that the rifle, . . . was evidence of a carjacking the persons in the house were not involved with?"[128] Officer Johnson had no answer,[129] but the Court does: there is nothing to support this belief. As corrected, the facts in the affidavit convey only that two African American males arrived in a carjacked vehicle—at some unknown time after an undated carjacking occurred—and entered the residence carrying firearms, which a party may, without evidence of more, legally open carry in the State of Louisiana.[130] *See Wilson v. City of Bastrop*, 26 F.4th 709, 715 (5th Cir. 2022) ("Louisiana law allows open carry of firearms." (citing *State v. Ferrand*, 664 So.2d 396, 397 (La. 1995) (per curiam) (noting "the public possession of an openly displayed handgun is not a crime in Louisiana" (citations

---

[128] R. Doc. No. 59, at 71.

[129] *See id.* at 72.

[130] To be sure, the presence of the firearm and the possession of the carjacked vehicle may have provided the reasonable suspicion necessary to *Terry* stop and search the two individuals, but this cannot amount to probable cause to search the residence. *Cf. Wilson*, 143 F.4th at 659 (stating that a suspect's "proximity to known or reported criminal activity" can be considered for reasonable suspicion).

omitted)))). Considering the totality of these circumstances, the Court finds the corrected warrant does not establish probable cause to search the residence.

* * *

The Court having found that defendant has met his burden of establishing, by a preponderance of the evidence, that the warrant affidavit contained false statements and material omissions that were made with reckless disregard for the truth, and because, after setting aside those false statements and material omissions, the Court also finds that the affidavit's remaining content is insufficient to establish probable cause, the search warrant "must be voided" and the evidence must be suppressed. *See Ortega I*, 854 F.3d at 826; *Kendrick*, 980 F.3d at 440. Having found the evidence should be suppressed, the Court need not consider defendant's other arguments in favor of suppression.

In reaching this conclusion, the Court recognizes the "central critique" of the exclusionary rule: "courts suppress probative—even decisive—evidence of guilt not because it is untrue but because the police erred in obtaining it." *Wilson*, 2025 WL 2490719, at *1. As recently stated by the Fifth Circuit, "however unwise" it might seem in this case, "the rule remains binding precedent," and the Court is "duty-bound to apply it." *Id.*

### IV. CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that defendant's motion[131] to suppress is **GRANTED**.

---

[131] R. Doc. No. 36.

**IT IS FURTHER ORDERED** that defendant's motion[132] to suppress results of the buccal swab search and seizure warrant is **DISMISSED AS MOOT**.

New Orleans, Louisiana, October 2, 2025.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

---

[132] R. Doc. No. 37.